UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
DATA DEVICE CORPORATION,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     19-CV-4105(JS)(ARL)

W.G. HOLT, INC. d/b/a HOLT INTEGRATED
CIRCUITS, HOLT INTEGRATED CIRCUITS,
INC., and SEAN SLEICHER,

                    Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:      John A. DeMaro, Esq.
                    Mark S. Mulholland, Esq.
                    Melissa Sanderleaf, Esq.
                    Ruskin Moscou Faltischek, P.C.
                    1425 RXR Plaza, East Tower, 15th Floor
                    Uniondale, New York 11556

For Defendants:     Michael R. Yellin, Esq.
                    Cole Schotz, P.C.
                    25 Main Street
                    Court Plaza North
                    Hackensack, New Jersey 07601

                    Benjamin Charles Deming, Esq., pro hac vice
                    Meredith Louise Williams, Esq., pro hac vice
                    Michael D. Adams, Esq., pro hac vice
                    Rutan & Tucker LLP
                    611 Anton Boulevard, Suite 1400
                    Costa Mesa, California 92626

SEYBERT, District Judge:

          Before the Court is Defendants W.G. Holt Inc. D/B/A Holt

Integrated Circuits ("W.G. Holt"), Holt Integrated Circuits, Inc.

(together with W.G. Holt, "Holt") and Sean Sleicher's

(collectively, "Defendants") motion to dismiss Plaintiff Data

Device Corporation's Second, Third, Fourth, Fifth, Sixth, and

1

Eighth claims for relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and to transfer this action to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1404.  (Mot., D.E. 32; Defs. Br., D.E. 32-1; Pl. Opp., D.E. 36; Defs. Reply, D.E. 37.)

For the following reasons, the motion to dismiss is GRANTED as to Plaintiff's Fourth, Fifth, Sixth, and Eighth claims for relief, and DENIED as to Plaintiff's Second and Third claims for relief.  In addition, the motion to transfer is DENIED.

<u>FACTUAL BACKGROUND</u>[1]

I.   <u>Data Device Corporation</u>

Plaintiff Data Device Corporation ("Plaintiff" or "Data Device") designs and manufactures connectivity, power, and control solutions for military, aeronautical, space and civilian applications from its headquarters in Bohemia, New York and other satellite offices.  (Compl., D.E. 1, ¶¶ 12, 18-19.)  This case involves one of Data Device's connectivity product lines: bus terminals[2] meeting MIL-STD-1553 specifications.  MIL-STD-1553 ("1553") is a specification established in 1973 by the United States Air Force and Department of Defense to describe the

---

[1] The following facts are drawn from the Complaint and are assumed to be true for purposes of this Memorandum and Order.

[2] "A bus is a subsystem that is used to connect computer components and transfer data between them."  *Bus*, TECHOPEDIA (last updated Sept. 30, 2020), https://www.techopedia.com/definition/2162/bus.

operational properties of serial data buses used in many of today's military, space, and civilian systems. (Id. ¶ 36.) According to Data Device, its 1553 bus solutions are designed into most aircraft, helicopter, drones, missile programs and space systems that utilize 1553 componentry, and its 1553 "Designer's Guide" is considered the industry standard for avionics engineers. (Id. ¶¶ 38, 40.) In connection with its 1553 product line, Data Device maintains confidential technical and business information, including, as relevant here: (1) Data Device's 1553 Driver Library Source Code; (2) technical data sheets and user guides; and (3) customer, product, and sales data.

Data Device's copyrighted 1553 Driver Library Source Code (the "1553 Driver Library"), embodied in nearly six hundred thousand lines of source code designed for six different operating systems, allows its 1553 customers to develop their own customized driver programming, thereby enhancing product utility and functionality. (Id. ¶¶ 44-45.) The underlying source code has been written and refined over the course of approximately twenty years, resulting in two generations: (1) the legacy EMACE Library; and (2) the ACE-X Library, which Data Device rolled out in 2007. (Id. ¶¶ 46, 51.) Customers access the 1553 Driver Library pursuant to a Software License Agreement. (Id. ¶ 50.) Moreover, customers who wish to access the ACE-X Library must execute a non-disclosure agreement that prohibits the duplication or transfer of the

3

underlying source code. (Id. ¶ 53.) Internally at Data Device, the ACE-X Library source code is maintained in a controlled-access Software Configuration Management ("SCM") database. (Id. ¶¶ 54-55.) Data Device grants employees access to the SCM database according to standard operating procedures ("SOPs"). (Id. ¶ 56.) Data Device's copyrighted Data Sheets and User Guides are scientifically formatted instruction manuals that set forth operating and performance protocols and technical information that enable customers to integrate 1553 components into broader platforms and on-board assemblies. (Id. ¶ 59.)

Most important to the issues here, Data Device also maintains extensive information regarding its 1553 component sales, such as purchaser volume information, product codes and specifications, configuration and performance preferences, and pricing and margin data (the "1553 Customer, Product & Sales Data"). (Id. ¶ 66.) The 1553 Customer, Product & Sales Data is maintained in a highly restrictive, password-protected database accessible on a "need to know" basis and contains Data Device's "Cimage Fusion" database, which houses engineering documents, drawings, and product specifications; "Glovia" platform, which holds accumulated sales data such as purchasing histories and pricing information; restricted-access Excel environment, which contains Data Device's standard pricelists, product margin

information, and pricing formulas; and "SalesLogix" customer database. (Id. ¶ 70.)

II.  Sleicher's Employment with Data Device and Holt

Defendant Sean Sleicher ("Sleicher") worked at Data Device from 2002 to 2014. From 2002 until 2005, Sleicher held the position of Senior Applications Engineer, during which time Data Device alleges he had access to "confidential information relating to the technical design of plaintiff's products, including plaintiff's line-up of MIL-STD-1553 components" to "facilitate his creation and revision of technical datasheets, manuals, user guides and other literature." (Id. ¶¶ 80-81.) Data Device further alleges that Sleicher had access to its "Cimage Fusion," 1553 Driver Library files, and "source code files" during that time. (Id. ¶¶ 82-84.) When Data Device promoted Sleicher to Marketing and Product Line Manager in 2009, Data Device alleges he gained access to the "Glovia" platform, restricted-access Excel environment, and "SalesLogix." At all times during his employment, Sleicher was bound by confidentiality obligations set forth in his employment agreement (Employment Agmt., Ex. 17 to Compl.), Data Device SOPs, and company ethics and privacy policies (Compl. ¶¶ 75-78).

In October 2014, Sleicher informed Data Device that he would be leaving the company; in November 2014, he started working at Holt, a California company with an office in Hauppauge, New

York.[3]  (Id. ¶¶ 91-93.)  In October 2018, Defendants announced the release of new software-compatible chips intended to compete with Data Device's 1553 chips.  (Id. ¶ 96.)  In March 2019, Holt announced the release of a new line of 1553 bus terminals characterized as "Drop-In Replacements" for Data Device's proprietary 1553 terminals ("6200 Suite").  (Id. ¶ 97; Holt Press Release, Ex. 3 to Compl.)  Data Device alleges that "mounting evidence demonstrates" Sleicher improperly assisted in the development and design of Holt's 1553 bus terminals by "disclosing to [Holt] highly confidential information concerning (i) [P]laintiff's sales activity, (ii) customer identities, (iii) customer configuration and operational preferences and requirements, (iv) pricing and margin information, and (v) confidential data relevant to [P]laintiff's -- and now [Holt's] -- determination to develop and design those specifically formatted 1553 components."  (Compl. ¶¶ 101-02.)  Although not directly relevant to the present motion, Data Device further alleges that Holt infringed on several of its copyrights by copying its 1553 Driver Library, Data Sheets, and User Guides.  (Id. ¶¶ 103-08.)

---

[3] Plaintiff alleges that Holt established a New York office only upon retaining Sleicher.  (Compl. ¶¶ 94-95.)

<u>PROCEDURAL HISTORY</u>

Data Device initiated this action against Defendants on July 16, 2016, alleging claims for (1) federal copyright infringement, 17 U.S.C. § 101 <u>et</u> <u>seq.</u>; (2) violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 <u>et</u> <u>seq.</u>; (3) misappropriation of trade secrets; (4) breach of Sleicher's fiduciary duty; (5) aiding and abetting breach of Sleicher's fiduciary duty; (6) unfair competition; (7) breach of contract as to Sleicher; and (8) unjust enrichment as to Holt. (Compl. ¶¶ 110-84.) On December 27, 2019, Defendants filed a motion to dismiss Data Device's Second, Third, Fourth, Fifth, Sixth, and Eighth causes of action pursuant to Federal Rule of Civil Procedure 12(b)(6). (<u>See</u> Defs. Br. at 1.) Defendants also seek to strike the Sixth Claim for Relief as redundant pursuant to Rule 12(f). (<u>Id.</u>) Defendants did not move to dismiss Plaintiff's copyright infringement and breach of contract claims. Instead, on May 22, 2020, Defendants filed a partial answer to these claims and asserted counterclaims against Data Device. (<u>See</u> Defs. Partial Answer and Countercl., D.E. 38.) Data Device's request for a more definite statement of Defendants' counterclaim is outstanding. (D.E. 51.)

DEFENDANTS' MOTION TO DISMISS

## I.   Standard for Motions to Dismiss

To withstand a motion to dismiss, a complaint must contain factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This plausibility standard is not a "probability requirement" and requires "more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotation marks and citation omitted).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## II.   Violation of the DTSA

Defendants seek dismissal of Plaintiff's second cause of action for violations of the DTSA.  "To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret." ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828, 2019 WL 3004161, at *3 (S.D.N.Y. July 10, 2019) (citing 18 U.S.C. § 1836(b)(1)).  The DTSA defines

8

"misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent." AUA Private Equity Partners, LLC v. Soto, No. 17-CV-8035, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(3)). Thus, the DTSA provides three alternative bases for liability: (1) acquisition, (2) disclosure, or (3) use. Id. (citations omitted). However, only those acts of misappropriation that occurred on or after May 11, 2016, the date of the DTSA's enactment, are covered by the Act. Id.

Both parties agree that only Data Device's 1553 Customer, Product & Sales Data qualify as trade secrets. (See Compl. ¶¶ 102, 137-48; Defs. Br. at 1-2.) However, the parties disagree whether Defendants misappropriated the 1553 Customer, Product & Sales Data. As alleged, the timeline shows that any acquisition of Data Device's trade secrets took place during Sleicher's employment there from 2002 to 2014. According to Defendants, because any acquisition would have occurred before the enactment of the DTSA in 2016, such conduct is not covered by the DTSA. (Defs. Br. at 12-14.) Moreover, Defendants argue that the Complaint pleads only conclusory allegations that Defendants used the 1553 Customer, Product & Sales Data in developing the 6200 Suite. (Id. at 9-12.) Data Device focuses on the timeline as

9

well, arguing that the complaint adequately alleges ongoing use of Data Device's 1553 Customer, Product & Sales Data from the time Sleicher joined Holt through the development and launch of Holt's 6200 Suite in 2019, a development and launch made possible only with Data Device's trade secrets.  (Pl. Opp. at 7-13.)

First, the Court agrees with Defendants that Plaintiff has failed to allege that Defendants acquired Data Device trade secrets in violation of the DTSA.  Plaintiff does not allege that Sleicher acquired its trade secrets after he left the company in October 2014.  Therefore, if he acquired Data Device's 1553 Customer, Product & Sales Data, he did so as an employee sometime between 2002 and 2014.  Because Sleicher was not employed at Data Device at the time of the DTSA's effective date, he did not acquire its trade secrets in violation of the DTSA.

Whether the Complaint plausibly alleges that Sleicher disclosed and Defendants used Data Device trade secrets to roll out the 6200 Suite is a much closer call.  On this point, Plaintiff's allegations may be summarized as follows: (1) Sleicher had access to Data Device's confidential 1553 Customer, Product & Sales Data as an employee; (2) shortly after Sleicher left Data Device, he joined Holt, and Holt began to design and develop its own 1553 product line, including the 6200 Suite, to compete with Data Device; and (3) the nature and technical parameters of the 6200 Suite demonstrate that its design, development, marketing and

10

sale were made possible by Data Device's confidential 1553
Customer, Product & Sales Data.  As discussed below, based on such
allegations, the Court may reasonably infer that Defendants
misappropriated Data Device's trade secrets and, therefore, the
Court finds that Data Device has met its burden, albeit barely, at
this stage.

      At the pleading stage, courts may reasonably infer that
the defendant used plaintiff's trade secret where the defendant
retains plaintiff's employees and launches a competing product
shortly thereafter.  See Oneida Group Inc. v. Steelite Int'l U.S.A.
Inc., No. 17-CV-957, 2017 WL 6459464, at *8 (E.D.N.Y. 2017).  In
Oneida, the plaintiff plausibly alleged that the defendant used
its marketing strategies, margins, and customer-specific
strategies, obtained by two former employees, to sell dish products
previously sold by the plaintiff.  Id.  Similarly, in Medtech
Products Inc. v. Ranir, LLC, the plaintiff stated a claim for trade
secret misappropriation where the complaint alleged that two
former employees with "extensive knowledge of [plaintiff's]
business and production process" disclosed that confidential
information to the defendant, which was able to bring a similar
product to market.  596 F. Supp. 2d 778, 790 (S.D.N.Y. 2008).
Here, although Defendants assert that, unlike in Oneida and
Medtech, they took years to design and develop the Suite 6200,
this does not rebut the plausible inference that Defendants used

11

Plaintiff's confidential 1553 Customer, Product & Sales Data to successfully design, develop, market and sell their 1553 product line, especially given Plaintiff's allegation, which the Court must accept as true, that "the lead time required for defendant [Holt] to develop its new line of MIL-STD-1553 components was approximately 3 to 4 years." (Compl. ¶ 98.)

To support their argument that Plaintiff failed to allege use of its trade secrets, Defendants rely heavily on Mastercraft Decorators, Inc. v. Orlando, 356 F. Supp. 3d 259 (W.D.N.Y. 2018), cited by Defs. Br. at 9-11. Notwithstanding its superficial resemblance to the instant case, the Court finds Mastercraft is distinguishable. There, the plaintiff, a custom glassware distributor, alleged that its former employee, Orlando, misappropriated its trade secrets, such as customer lists and pricing information, to solicit customers at his new employer. Id. at 264. Although the plaintiff alleged that the defendants misappropriated its customer lists and other confidential information to solicit its customers, it failed to identify specific customers the defendants contacted using its trade secrets. Id. at 273. The Mastercraft court held that the plaintiff's failure to identify the trade secrets at issue was fatal to its claims and, the Court observed, obiter dictum, that allegations as to how the defendants used its trade secrets were conclusory. Id. at 274. However, unlike Mastercraft, this action

12

involves more than a simple customer list, the use of which would have been easier to ascertain and plead.  Here, Data Device alleges that Defendants used a host of confidential data, including customer configuration and operational preferences and requirements, pricing and margin information, sales activity, and customer identities to bring a new product to market and sell it at competitive costs.  (Compl. ¶ 102.)  "At this stage, without discovery, it is to be expected that Plaintiff would have limited knowledge of the extent to which Defendant has used their trade secrets."  Next Commc'ns, Inc. v. Viber Media, Inc., No. 14-CV-8190, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016) (holding plaintiffs sufficiently alleged that defendant used their trade secrets in developing a feature for its own app, even though the allegations were based on "second-hand knowledge" from one of defendant's investors); Balance Point Divorce Funding, LLC v. Scrantom, 978 F. Supp. 2d 341, 353 (S.D.N.Y. 2013) (concluding plaintiff sufficiently raised an inference that defendant used its trade secret where defendant was positioned to benefit from use of the trade secret because "knowledge of the [trade secret] would enable [defendant] inevitably to better compete with [plaintiff]").  This is especially true where, as here, the way Defendant may have used Plaintiff's trade secrets are "peculiarly

within the opposing party's knowledge."[4] <u>Next Commc'ns, Inc.</u>, 2016 WL 1275659, at *5 (quoting <u>Boykin v. KeyCorp</u>, 521 F.3d 202, 215 (2d Cir. 2008)).

Fundamentally, Defendants' reading of the Complaint fails to acknowledge Plaintiff's allegations in their entirety. <u>Gen. Sec., Inc. v. Comm. Fire & Sec., Inc.</u>, No. 17-CV-1194, 2018 WL 3118274, at *4 (E.D.N.Y. June 25, 2018). Defendants would have the Court limit Plaintiff's allegations regarding Defendants' supposed use of Data Device trade secrets to a single paragraph in the Complaint, that is, paragraph 102. (<u>See</u> Defs. Br. at 11-12 (discussing paragraph 102).) Although paragraph 102 is central to the cause of action, Plaintiff's allegations regarding Defendants' use of its trade secrets are not so limited. (<u>See, e.g.</u>, Compl. ¶¶ 96-97, 99, 109, 181 (alleging Defendants are "actively selling [D]efendants' new line of MIL-STD-1553 products").) Moreover, although not directly relevant to its DTSA claim, the Court acknowledges Plaintiff's allegations of copyright infringement as to its 1553 Driver Library, Data Sheets, and User Guides. (<u>Id.</u> ¶¶ 103-08.)

Although a close call, the Court finds that a fair reading of the Complaint in its entirety leads to the reasonable

---

[4] For example, it is difficult to say how Plaintiff, without discovery, could more thoroughly plead how Defendants used Plaintiff's confidential margin, pricing, and forecast data to select which 1553 components to develop.

inference that Defendants misappropriated Data Device's trade secrets. Accordingly, Defendants' motion to dismiss Plaintiff's Second claim for relief under the DTSA is DENIED.

III. <u>Misappropriation of Trade Secrets Under New York Common Law</u>

Plaintiff's third cause of action asserts a claim for misappropriation of trade secrets under New York common law. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." <u>N. Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 43-44 (2d Cir. 1999), <u>cited</u> <u>by</u> <u>Schroeder v. Pinterest Inc.</u>, 17 N.Y.S.3d 678, 690 (N.Y. App. Div. 1st Dep't 2015).

"The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law." <u>ExpertConnect, L.L.C.</u>, 2019 WL 3004161, at *7 (citing <u>Free Country Ltd. v. Drennen</u>, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016)). The Court finds that Plaintiff plausibly states a claim for misappropriation of trade secrets under New York law for substantially the same reasons that the Complaint sufficiently pleads a DTSA claim. Accordingly, Defendants' motion to dismiss Plaintiff's Third claim for relief for misappropriation under New York law is DENIED.

15

IV.  <u>Breach of Fiduciary Duty and Aiding and Abetting Breach of a
     Fiduciary Duty</u>

     Defendants argue that Plaintiff's claim for breach of
fiduciary duty (Count Four) as to Sleicher is duplicative of its
claim for breach of contract (Count Seven). (Defs. Br. at 16-18.)
The Court agrees.

     Under New York law, "a cause of action alleging breach
of a fiduciary duty, which . . . is merely duplicative of a breach
of contract claim, cannot stand." <u>Barbagallo v. Marcum LLP</u>, No.
11-CV-1358, 2012 WL 1664238, at *10 (E.D.N.Y. May 11, 2012)
(quoting <u>Hylan Elec. Contr., Inc. v. MasTec N. Amer., Inc.</u>, 903
N.Y.S.2d 528, 530 (N.Y. App. Div. 2d Dep't 2010)).  Such claims
are duplicative where the allegations of fiduciary wrongdoing "are
either expressly raised in plaintiff's breach of contract claim or
encompassed within the contractual relationship by the requirement
implicit in all contracts of fair dealings and good faith." <u>Balta
v. Ayco Co., LP</u>, 626 F. Supp. 2d 347, 360 (W.D.N.Y. 2009) (quoting
<u>Brooks v. Key Trust Co. Nat'l Ass'n</u>, 809 N.Y.S.2d 270, 273 (N.Y.
App. Div. 3d Dep't 2006)).  Accordingly, "a plaintiff may not
maintain both a contract claim and a breach of fiduciary duty
claim, without 'allegations that, apart from the terms of the
contract, the parties created a relationship of higher trust than
would arise from their contracts alone, so as to permit a cause of
action for breach of a fiduciary duty independent of the

16

contractual duties.'" <u>Id.</u> at 360-61 (quoting <u>Brooks</u>, 809 N.Y.S. at 273) <u>cited</u> <u>in</u> Pl. Opp. at 21-22.   A party may pursue a claim for breach of fiduciary duty; however, this legal duty must "spring from circumstances extraneous to, and not constituting elements of, the contract. . . ." <u>Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Trust</u>, No. 06-CV-871, 2007 WL 951565, at *2 (N.D.N.Y. Mar. 27, 2007) (quoting <u>LaBarte v. Seneca Res. Corp.</u>, 728 N.Y.S.2d 618, 622 (N.Y. App. Div. 4th Dep't 2001)).[5]

Plaintiff's allegations regarding Sleicher's alleged breach of his fiduciary duty are duplicative of its breach-of-contract allegations, because they are premised on Sleicher's contractual duty not to misappropriate Plaintiff's confidential trade secrets and copyrighted materials. (<u>Compare</u> Compl. ¶ 155 (alleging Defendant Sleicher breached his fiduciary duty by "disclosing to [Holt] confidential and proprietary information"), <u>with</u> <u>id.</u> ¶ 176 (alleging Defendant Sleicher breached his contractual obligations by "disclos[ing] plaintiff's Proprietary Information" to Holt).)   Because Plaintiff failed to allege that Defendant Sleicher owed a duty independent of his contractual duties, let alone a "relationship of higher trust" between the

---

[5] The same standard applies to Plaintiff's claim for aiding and abetting breach of fiduciary duty (Count Five).   <u>See</u> <u>Uni-World Cap., L.P. v. Preferred Fragrance, Inc.</u>, 43 F. Supp. 3d 236, 245 (S.D.N.Y. 2014) (dismissing breach of fiduciary duty claim and aiding and abetting the same alleged breach of fiduciary duty where they were duplicative of the alleged breach of contract).

parties, Plaintiff's claim for breach of fiduciary duty cannot stand.

Accordingly, Defendants' motion to dismiss Plaintiff's Fourth and Fifth claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty is GRANTED.

V.   <u>Unfair Competition Under New York Common Law</u>

Defendant argues that Plaintiff's Sixth claim for unfair competition is duplicative of its trade secrets and breach of contract claim as to Sleicher because they are based on the same set of facts. (Defs. Br. at 15.) Again, the Court concurs.

To state a claim for unfair competition, "a plaintiff must allege that a defendant misappropriated plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so." <u>Schroeder</u>, 17 N.Y.S.3d at 690; <u>accord Telecom Int'l Am., Ltd. v. AT&T Corp.</u>, 280 F.3d 175, 197 (2d Cir. 2001). "A claim for unfair competition based on the same allegations as a claim for misappropriation of trade secrets is treated as a single cause of action." <u>Uni-Systems, LLC v. U.S. Tennis Ass'n, Inc.</u>, 350 F. Supp. 3d 143, 179 (E.D.N.Y. 2018) (citing <u>Abernathy-Thomas Eng'g Co. v. Pall Corp.</u>, 103 F. Supp. 2d 582, 600 (E.D.N.Y. 2000)); <u>see also</u> <u>Mastercraft</u>, 356 F. Supp. 3d at 269 ("Courts often analyze misappropriation of trade secret and confidential information and unfair competition claims together."). Here, Plaintiff's claim for unfair competition is

based on its allegation that Defendants "misappropriated [P]laintiff's valuable, proprietary information including trade secret materials and data." (Compl. ¶ 166.) Therefore, Plaintiff's unfair competition claim is duplicative of its claim for misappropriation of trade secrets.[6] Accordingly, the Court GRANTS Defendant's motion to dismiss the unfair competition claim, understanding that the two claims rise or fall together, and that Plaintiff may not ultimately prevail on both. Uni-Systems, LLC, 350 F. Supp. 3d at 179.

## VI. Unjust Enrichment

The Complaint's eighth cause of action is a claim for unjust enrichment made pursuant to New York law, which requires a plaintiff to plead that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 339 (2d Cir. 2011) (citation omitted); accord Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d 743, 746 (N.Y. 2012). A plaintiff cannot succeed on an unjust enrichment claim under New York law "unless [plaintiff] has a sufficiently close relationship with the other party." Schroeder, 17 N.Y.S.3d at 690 (quoting Georgia

---

[6] Because the Court finds that the unfair competition claim is duplicative of the misappropriation claim, it need not decide whether it is also duplicative of the breach of contract claim.

<u>Malone</u>, 973 N.E.2d at 746).  Further, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  <u>Corsello v. Verizon New York, Inc.</u>, 967 N.E.2d 1177, 1185 (N.Y. 2012).

Here, it is uncontested that Plaintiff's unjust enrichment claim arises out of the same subject matter as its breach of contract claim. (<u>Compare</u> Compl. ¶ 176, <u>with</u> <u>id.</u> ¶ 181.) The Complaint's breach of contract claim is premised on the allegation that Sleicher breached his contractual obligations by acquiring and using Data Device's confidential information for Holt's benefit.  The unjust enrichment claim arises from the same alleged misconduct: that Defendants "benefitted by selecting for development, developing and actually selling competitive products -- all through the exploitation of property, know-how and proprietary works belonging exclusively to [P]laintiff." (<u>Compl.</u> ¶ 181.)  Accordingly, Defendants' motion to dismiss Plaintiff's unjust enrichment claim against Sleicher is GRANTED.  <u>See</u> <u>ExpertConnect, L.L.C.</u>, 2019 WL 3004161, at *10.

Moreover, Plaintiff has failed to allege a sufficiently close relationship between Data Device and Sleicher.  <u>See Georgia Malone</u>, 973 N.E.2d at 746.  Data Device and Holt are in direct competition.  As Defendants argue, any relationship between rival companies like Data Device and Holt is "too attenuated" to sustain an unjust enrichment claim.  <u>Id.</u>; <u>see also</u> <u>Schroeder</u>, 17 N.Y.S. at

670.   Accordingly, Defendants' motion to dismiss Plaintiff's unjust enrichment claim against Holt is GRANTED.

<u>DEFENDANTS' MOTION TO TRANSFER</u>

Defendants seek a transfer pursuant to 28 U.S.C. § 1404(a) ("Section 1404"), which states that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." "A motion to transfer requires a two-fold inquiry: (1) whether the action could have been commenced in the transferee court, and (2) whether a transfer is appropriate considering the convenience of parties and witnesses and the interest of justice." <u>Sam v. Selip & Stylianou, LLP</u>, No. 15-CV-2780, 2015 WL 9462109, at *3 (E.D.N.Y. Dec. 28, 2015) (internal quotation marks and citations omitted).  In determining whether a transfer is warranted, this Court may also consider

> (1) convenience of witnesses; (2) convenience of parties; (3) locus of operative facts; (4) availability of process to compel the attendance of unwilling witnesses; (5) location of relevant documents and other sources of proof; (6) relative means of the parties; (7) relative familiarity of the forum with the governing law; (8) weight accorded to the plaintiff's choice of forum and (9) the interests of justice.

<u>Id.</u> (quoting <u>Kroll v. Lieberman</u>, 244 F. Supp. 2d 100, 102 (E.D.N.Y. 2003)).  "[M]otions for transfer lie within the broad discretion

of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." <u>Aldino v. I.K. Sys., Inc.</u>, No. 18-CV-6781, 2019 WL 4887655, at *2 (E.D.N.Y. Sept. 30, 2019) (quoting <u>In re Cuyahoga Equip. Corp.</u>, 980 F.2d 110, 117 (2d Cir. 1992) (further citation omitted)). However, "[t]he party requesting transfer carries the burden of making out a strong case for transfer, [and] the plaintiff's choice of forum should not be disturbed unless the balance of factors tips decidedly in favor of a transfer." <u>Carson Optical, Inc. v. Hawk Importers, Inc.</u>, No. 12-CV-1169, 2013 WL 12370815, at *2 (E.D.N.Y. 2013) (internal quotation marks and citations omitted). The Court finds that Defendants have failed to make out a strong case for transfer, as it would only shift the burden of inconvenience from one party to the other. <u>Dwyer v. General Motors Corp.</u>, 853 F. Supp. 690, 694 (S.D.N.Y. 1994) (citing <u>Schieffelin & Co. v. Jack Co. of Boca, Inc.</u>, 725 F. Supp. 1314, 1321 (S.D.N.Y. 1989)).

Since the parties do not dispute that this matter could have been initiated in the Central District of California, the Court's inquiry is limited to whether transfer is appropriate in light of the factors enumerated, <u>supra</u>. Defendants focus primarily on the relative means of the parties and witness convenience, particularly the convenience of non-party witnesses. (Defs. Br. at 20-21.) Defendants argue that Holt is "very small compared to [Data Device] (and its parent Transdigm) whose sales, employees,

22

and means far exceed that of Holt." (<u>Id.</u> at 21.) Moreover,
Defendants identify twenty-six potential witnesses -- fifteen Holt
employees and eleven third parties -- that reside in Southern
California. (<u>Id.</u>)

        The Court is obliged to consider the relative means of
the parties when, as here, "an apparent disparity exists."
<u>Pecorino v. Vutec Corp.</u>, 934 F. Supp. 2d 422, 438 (E.D.N.Y. 2012)
(citations omitted). However, "[a] party arguing for or against
transfer because of inadequate means must offer documentation to
show that transfer (or lack thereof) would be unduly burdensome to
his finances." <u>Id.</u> at 439 (quoting <u>Neil Bros. Ltd. v. World Wide</u>
<u>Lines, Inc.</u>, 435 F. Supp. 2d 325, 331 (E.D.N.Y. 2006)). Here,
while Defendants submit documentation detailing the comparative
size of the two companies, they fail to offer sufficient
documentation showing why litigating in New York would be unduly
burdensome to their finances. In connection with their request,
Defendants submitted an affidavit from their President and CEO,
David J. Meade. (Meade Decl., D.E. 32-2.) Meade averred that
"Holt will face hardship if forced to litigate in New York, because
travel time for Holt's directors of design and sales, key engineers
and myself . . . will take time away from running our relatively
smaller business in California," before conceding that "[t]his
litigation will burden Holt and disrupt our business in any event."
(<u>Id.</u> ¶ 13.) This testimony is similar to testimony the Court found

                                23

insufficient in Pecorino.   See Pecorino, 934 F. Supp. 2d at 439
(finding insufficient to carry Section 1404 burden reliance upon
only the declaration of defendant's President and General Manager
that "the costs involved with sending several [defendant] employee
witnesses to trial . . . and the impact of having several members
of upper management away from [defendant's] offices . . . will
have a substantial, negative financial effect").   As in Pecorino,
without more, this Court finds that Defendants have failed to
demonstrate that "it would be prohibitively expensive for
[Defendants] to prosecute in the current district."   Id.
Accordingly, this factor does not weigh in favor of transfer.

As to the convenience of the witnesses, this Court must
consider "the materiality, nature, and quality of each witness,
not merely the number of witnesses in each district."   Indian
Harbor Ins. Co. v. Factory Mut. Ins. Co., 419 F. Supp. 2d 395, 404
(S.D.N.Y. 2005) (quoting Royal & Sunalliance v. British Airways,
167 F. Supp. 2d 573, 577 (S.D.N.Y. 2001)).   Although Defendants
list twenty-six witnesses who will be inconvenienced by
proceedings in New York, it appears they have done so selectively,
omitting seventeen other witnesses from their initial disclosures
who are located outside California.   (French Decl., D.E. 34, ¶
54.)   Both parties have named witnesses that reside and work in
their respective home states that would be inconvenienced by having
to travel to testify, and whose travel would inconvenience the

24

productivity of their companies.   (Id. ¶ 40; Meade Decl., ¶ 12).
Accordingly, the convenience of witnesses cannot be accommodated
by transferring venue, as inconvenience would simply be shifted
from one set of witnesses to the other.   Dwyer, 853 F. Supp. at
694.

      To the extent argued, the Court is not persuaded that
the remaining factors weigh strongly in favor of transferring this
case.   Accordingly, Defendants' motion to transfer is DENIED.


      [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

<u>CONCLUSION</u>

Accordingly, IT IS HEREBY ORDERED that Defendants' motion to dismiss is GRANTED in part and DENIED in part, resulting in Plaintiff's Fourth, Fifth, Sixth, and Eighth claims being dismissed, but its Second and Third claims remaining; and,

IT IS FURTHER ORDERED that Defendants' motion to transfer is DENIED.


SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    November 30 2020
          Central Islip, New York

26